IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Criminal Case No. 07–cr–00259–EWN

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  ROBERT CALVIN TWIDDY,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

Defendant Robert Calvin Twiddy stands accused of sexual contact with and physical abuse of a child in violation of 18 U.S.C. §§ 13, 113(a)(5), 2244(a)(5) and Colorado Revised Statutes section 18–6–401(7)(b)(1).  This matter is before the court on: (1) Defendant's "Motion to Suppress Statements," filed July 12, 2007; (2) "Government's Motion for Alternative to Live In Court [sic] Testimony for Child Witness," filed July 20, 2007; and (3) "Government's Motion for Reciprocal Discovery and Other Relief as Deemed Appropriate," filed October 9, 2007.

# FACTS

On October 11, 2007, this court held an evidentiary hearing on Defendant's motion to suppress. Three prosecution witnesses testified at the hearing: (1) Agent John Trevor Altman; (2) Agent Jeffrey Huston; and (3) Agent Justin Ratley. One defense witness, Agent Blake G. Hamilton, also testified. The following constitutes my findings of fact concerning the motion to suppress.

## 1. Background

### a. Defendant's Background

In October 2006, Defendant was thirty-six years old and had a high school education. (10/11/07 Tr. at 138 [Ratley Test.], 79 [Huston Test.] [hereinafter "Tr."].) Defendant and his wife, who was in the military at the time, lived on the military installation in Fort Carson, Colorado, with their three children from various marriages. (*See id.* at 144 [Hamilton Test.].) On at least one occasion prior to the instant prosecution, Defendant had been arrested, read his rights, and requested counsel. (*Id.* at 139–40 [Ratley Test.].)

### b. Allegations

On October 13, 2006, Defendant's thirteen-year-old daughter, C.T., called 911 to report that she had been abused by Defendant's wife and that her five-year-old stepbrother, C.J., had been abused by Defendant. (Statement of C.T. [filed under seal on June 21, 2007].) C.T. alleged that Defendant would slap and choke C.J., and had made C.J. wear soiled underwear on his head as a punishment for wetting his pants. (*Id.*) C.T. further alleged that on October 12, 2006,

2

Defendant had punished C.J. for defecating in his pants by attaching a belt buckle to the child's scrotum and then yanking the buckle from the child's body.  (*Id.*)

**2.**      ***Interviews***

      **a.**      ***Altman Interview***

Agent Altman is employed in the Criminal Investigation Division ("CID") of the United States Army Criminal Investigation Command in Fort Carson, Colorado.  (Tr. at 2 [Altman Test.].)  On October 13, 2006, Agent Altman met with his supervisor to discuss the CID's investigation of child abuse allegedly perpetrated by Defendant.  (*Id.* at 3 [Altman Test.].)  Thereafter, Agent Altman contacted Defendant at his place of employment and requested that he come to the CID office to discuss the allegations.  (*Id.* at 4 [Altman Test.].)  Defendant agreed to go to the CID office after his shift at work ended.  (*Id.* at 5–6 [Altman Test.].)

Defendant arrived for the interview shortly before 8:00 P.M.  (*Id.*)  Agent Altman led Defendant into an interview room with a computer desk in the corner, a two-way mirror, and two chairs.  (*Id.* at 7 [Altman Test.].)  Defendant sat on the chair closest to the door, approximately three to four feet from Agent Altman.  (*Id.* at 8 [Altman Test.].)

During the first fifteen minutes of the interview, Agent Altman informed him that he was free to leave to use the restroom or to get a drink and read Defendant his *Miranda* rights.  (*Id.*)  Defendant acknowledged being informed of his rights by signing a waiver.  (*Id.* at 9 [Altman Test.]; Govt. Ex. 1 [10/13/06 Waiver].)

Thereafter, Agent Altman explained the nature of the allegations against Defendant and asked Defendant to explain what had transpired on the evening of October 12, 2006.  (Tr. at

3

11–12 [Altman Test.].)  Defendant recounted an unremarkable evening at home with his children. (*Id.* at 12 [Altman Test.].)

For the next ten minutes, Agent Altman paraphrased Defendant's version of events in order to confirm that he understood Defendant's narrative.  (*Id.* at 12–13 [Altman Test.].)  Then, for the next twenty to thirty minutes, Agent Altman challenged Defendant's version of the events, at times asserting that Defendant's story was untruthful or was "bullshit."  (*Id.* at 13–15 [Altman Test.].)  At one point, the exchange between the men became quite heated, and Agent Altman's supervisor interrupted the interview to speak momentarily with Agent Altman outside of the room.  (*Id.* at 51–52 [Altman Test.].)  Thereafter, Agent Altman returned to the room and resumed the interview.  (*Id.* at 52 [Altman Test.].)

After further discussing the alleged incidents of abuse, Agent Altman stepped out to confer with his associates.  (*Id.* at 18–20 [Altman Test.].)  Five to ten minutes later, Agent Altman returned and found Defendant supine on the floor.  (*Id.* at 20 [Altman Test.].)  Defendant explained that his back hurt.  (*Id.*)  Nevertheless, Defendant expressed his willingness to continue the interview.  (*Id.* at 21 [Altman Test.].)

Agent Altman then told Defendant that Defendant's wife was being interviewed and her version of events was inconsistent with that recounted by Defendant.  (*Id.*)  This was completely untrue.  (*Id.* at 21, 56–57 [Altman Test.].)  Defendant requested to see his wife, but Agent Altman said Defendant could see her only once the interview was complete.  (*Id.* at 21–22 [Altman Test.].)  Agent Altman asked Defendant if he would be willing to return to the CID

office to undergo a polygraph examination, and Defendant said he would.  (*Id.* at 24 [Altman Test.].)

For the next thirty to forty-five minutes, Defendant and Agent Altman worked together to distill Defendant's story into a sworn statement; Agent Altman sat at the computer desk typing, and Defendant sat next to him helping to correct errors.  (*Id.* at 24–27, 65 [Altman Test.].)  Once the statement was complete, Agent Altman explained that it would be a legally binding document and gave Defendant time to read it for accuracy.  (*Id.* at 28 [Altman Test.].)  At approximately 11:00 P.M., Defendant initialed each page of the statement, signed it, and departed.  (*Id.* at 28–29 [Altman Test.].)

In the October 13, 2006, statement, Defendant admitted that: (1) he had stricken his children with a belt as punishment, but that he had not done so for four to five months; (2) he had made C.J. wear urine-soaked underwear on his head as punishment for urinating in his pants; and (3) he had made C.J. stick his nose on a couch after the child had urinated on it.  (Govt. Ex. 2 [10/13/06 Statement].)  Defendant denied ever having attached a belt to C.J.'s scrotum.  (*Id.*)  Rather, Defendant stated that while playing with C.J. on October 12, 2006, he had briefly attached a dog leash to the child's ear in a joking manner.  (*Id.*)

No other record of the interview was made.  (Tr. at 40–41 [Altman Test.].)  At no time during the three-hour interview did: (1) Defendant request that the interview end; or (2) Agent Altman threaten Defendant or make any promises.  (*Id.* at 28–29, 66 [Altman Test.].)

### b.    FBI Encounter

Agent Hamilton is employed by the Federal Bureau of Investigation ("FBI").  (*Id.* at 143 [Hamilton Test.].)  Agent Hamilton became involved in the investigation of the case because the allegations involved a civilian living on a military installation.  (*Id.* at 144 [Hamilton Test.].)

On October 17, 2006, Agent Hamilton and an associate approached Defendant at his place of employment.  (*Id.* at 145 [Hamilton Test.]; *see* Def. Ex. A–6 [10/17/06 Notes].)  Agent Hamilton introduced himself and informed Defendant that the FBI considered the allegations against Defendant to be serious.  (Tr. at 145 [Hamilton Test.].)  Agent Hamilton told Defendant that he expected Defendant's full cooperation and candor in connection with the FBI's investigation of the abuse allegations.  (*Id.* at 147 [Hamilton Test.].)

### c.    The Polygraph Examination

On November 10, 2006, Defendant arrived at the Fort Carson CID office to undergo a polygraph examination with Agent Huston, a CID polygraph specialist.  (*Id.* at 67, 70 [Huston Test.].)  Defendant arrived at and departed from the CID office of his own accord.  (*Id.* at 76 [Huston Test.].)  Agent Huston conducted the examination in a room equipped with a two-way mirror, a polygraph chair, two regular chairs, and a computer.  (*Id.* at 75, 93 [Huston Test.].)  Agents Ratley and Hamilton observed the examination through the two-way mirror.  (*Id.*)

Upon Defendant's arrival, Agent Huston promptly advised him of his *Miranda* rights, which Defendant confirmed by signing a waiver.  (*Id.* at 79–80; Govt. Ex. 3 [11/10/06 Waiver].)  After some small talk, Defendant recounted a version of events that comported with his prior sworn statement.  (Tr. at 83–84 [Huston Test.].)  Thereafter, Agent Huston took Defendant

through the list of questions he planned to ask during the polygraph examination and then allowed

Defendant to take a restroom break while the polygraph was readied.  (*Id.* at 85–86 [Huston

Test.].)  In past examinations conducted by Agent Huston, other polygraph examinees had chosen

to leave the CID office during this break.  (*Id.* at 85 [Huston Test.].)

Upon Defendant's return, Agent Huston conducted the polygraph examination, asking

Defendant to answer the previously reviewed list of questions three times.  (*Id.* at 87–88 [Huston

Test.].)  Upon completion of this series of questions, Agent Huston left to score the test in an

adjacent room.  (*Id.* at 88 [Huston Test.].)

The results of the test were inconclusive.  (*Id.* at 121 [Huston Test.].)  When Agent

Huston returned to the interview room, he informed Defendant that he "did not pass" the

examination.  (*Id.* at 88 [Huston Test.].)  During the course of the next one and one-half hours of

questioning, Defendant admitted that he had not been completely truthful in his initial written

statement and acknowledged he might have accidentally caused an injury to C.J.'s genitalia while

playfully attempting to attach a leash to the child's underwear.  (*Id.* at 89 [Huston Test.].)

In light of the new explanations, Agent Huston requested that Defendant undergo a

second phase of polygraph testing.  (*Id.* at 90–91 [Huston Test.].)  Defendant agreed.  (*Id.* at 91

[Huston Test.].)  Agent Huston then gave Defendant the opportunity to leave for lunch.  (*Id.* at

91–92 [Huston Test.].)  Defendant left the premises at 12:45 P.M. and returned at 1:45 P.M.  (*Id.*

at 92 [Huston Test.], 140 [Ratley Test.].)

Prior to administering the second phase of testing, Agent Huston reviewed a new series of

questions with Defendant.  (*Id.* at 92 [Huston Test.].)  At approximately 2:45 P.M., Agent Huston

connected Defendant to the polygraph machine and had him answer the new questions three times.  (*Id.* at 92–93, 96–97, 131 [Huston Test.].)  Thereafter, Agent Huston again left the room to score the results, determining that Defendant's answers were "deceptive."  (*Id.* at 93 [Huston Test.].)  Upon returning with the results, Agent Altman told Defendant that if they did not get to "the bottom of this," Defendant would "get[] looked at with being charged" with sexual abuse.  (*Id.* at 133 [Huston Test.].)  When confronted with the results, Defendant again revised aspects of his story.  (*Id.* at 93–94 [Huston Test.].)

Agent Huston and Defendant then sat at the computer in the interview room; the agent typed and Defendant looked on to correct errors.  (*Id.* at 94–95 [Huston Test.].)  Agent Huston printed the statement and left the room while Defendant reviewed it.  (*Id.* at 96–97 [Huston Test.].)  At 4:41 P.M., Defendant initialed each page of the statement, signed it, and swore to its veracity.  (*Id.*; Govt. Ex. 4 [11/10/06 Statement].)

In the November 10, 2006, statement, Defendant averred that while playing with C.J. on the night of October 12, 2006, he had clipped a leash to his own ear and then placed the loop of the leash around C.J.'s ear.  (*Id.*)  Defendant stated that he had then clipped the leash to the crotch of C.J.'s underwear and promptly removed it, unaware that he might have pinched the child's scrotum with the clasp.  (*Id.*)  Defendant stated that C.J. had not indicated that he had been hurt.  (*Id.*)

After the statement was finalized, Agent Huston asked Defendant to undergo a third phase of polygraph testing in order to confirm the statement's veracity.  (Tr. at 134 [Huston Test.].)  Defendant refused.  (*Id.* at 135 [Huston Test.].)

Of the approximately seven hours Defendant was at the CID office, Agent Huston estimates that he spent approximately six hours with Defendant.  (*Id.* at 99–100 [Huston Test.].)  Agent Huston claims he never threatened Defendant or made any promises to him during the course of the interview.  (*Id.* at 100 [Huston Test.].)  In his sworn statement, Defendant acknowledged he was treated fairly and was allowed to take breaks during the course of the interview.  (Govt. Ex. 4 [11/10/06 Statement].)

## ANALYSIS

*1.*    ***Motion to Suppress Statements***

Defendant argues that he was coerced into making involuntary statements during both interviews.  (Mot. to Suppress Statements at 4 [filed July 12, 2007] [hereinafter "Def. Br."].)  First, Defendant asserts he made involuntary statements during the October 13 interview because Agent Altman interrogated him in a threatening manner and lied about statements made by Defendant's wife.  (Supplement to Mot. to Suppress Statements at 2, 4 [filed Aug. 18, 2007] [hereinafter "Def. Suppl."].)  Second, Defendant asserts he made involuntary statements during the November 10 interview, after long hours of questioning, when Agent Huston threatened him by saying that if they did not "get to the bottom of this," he would be charged with sexual abuse.  (*Id.* at 3–4; *see* Tr. at 133.)  The Government argues that the totality of the circumstances — including that Defendant was read his *Miranda* rights, was of an age and level of education that did not make him susceptible to coercion, had prior encounters with the criminal justice system, was allowed to take breaks during the interviews, and was never threatened or subjected to

physical punishment — demonstrates that Defendant's statements were voluntary.  (Gov't's Resp.
to Def.'s Mot. to Suppress Statements [filed July 20, 2007] [hereinafter "Gov't. Resp."].)

"When the [G]overnment obtains incriminating statements through acts, threats, or
promises which cause [a] defendant's will to be overborne, it violates the defendant's Fifth
Amendment rights and the statements are inadmissible at trial as evidence of guilt."  *United States
v. Toles*, 297 F.3d 959, 966 (10th Cir. 2002) (citations omitted).  "The Government bears the
burden of showing, by a preponderance of the evidence, that a confession is voluntary."  *United
States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (citing *Missouri v. Seibert*, 542 U.S. 600,
608 n.1 [2004]).  "A determination of voluntariness is based on the totality of the circumstances."
*United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998) (citations omitted).  The
determination is based on an examination of several factors, including "the characteristics of the
suspect, such as his age, intelligence, and education, and the details of the interrogation, such as
whether the suspect was informed of his rights, the length of the detention and the interrogation,
and the use or threat of physical force."  *Id.* (citations omitted).  "'No single factor is
determinative.'"  *Lopez*, 437 F.3d at 1063 (quoting *United States v. Lugo*, 170 F.3d 996, 1004
[10th Cir. 1999]).

Based on the totality of the circumstances, I find that none of Defendant's statements was
the product of coercion that caused Defendant's will to be overborne.  Turning first to the details
of the interrogations, I note that Defendant does not dispute the Government's assertion that he
was never taken into custody.  *See United States v. Chavez Quintana*, No. 07–10011–01–WEB,
2007 WL 2091171, at *4 (D. Kan. July 20, 2007) (considering fact that defendant was not in

custody in assessing voluntariness of admission).  Rather, Defendant arrived at and departed from both interviews on his own.  Indeed, during the second interview, Defendant left the CID office during lunch and chose to return.

Regardless of whether the interrogation was custodial, prior to initiating their interviews, both Agent Altman and Agent Huston read Defendant his *Miranda* rights and had him sign a waiver indicating he understood his rights and was willing to discuss the matters under investigation without the presence of an attorney.  (Govt. Ex. 1 [10/13/06 Waiver]; Govt. Ex. 3 [11/10/06 Waiver].)  Both waivers clearly state that Defendant had the right to stop answering questions at any time.  *See Lopez*, 437 F.3d at 1065 (noting the administration of *Miranda* warnings before interrogation militates against a finding of coercion).  Moreover, both of Defendant's sworn statements bear indica of voluntariness.  Defendant signed and initialed each page of the statements, and both conclude with the following affirmation:

> I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

(Govt. Ex. 2 [10/13/06 Statement]; Govt. Ex. 4 [11/10/06 Statement].)

The first interview lasted about three hours, and the second spanned seven hours.  However, Defendant was afforded opportunities for appropriate breaks to eat and attend to his personal needs.  Indeed, in his second statement, Defendant attested to the fact that he was given appropriate breaks and felt he was treated fairly.  (Govt. Ex. 4 [11/10/06 Statement].)  None of this suggests that Defendant's will was overborne.  *See Payne v. McKune*, 280 F. Supp. 2d 1259, 1266 (D. Kan. 2003) (finding seven-hour interview with breaks for food and personal needs did

not render statements involuntary) (citing *Clark v. Murphy*, 331 F.3d 1062, 1073 [9th Cir. 2003] [detention in interview room for eight hours did not render statements involuntary]; *Jenner v. Smith*, 982 F.2d 329, 334 [8th Cir. 1993] [six or seven hour questioning not coercive]; *United States v. Lehman*, 468 F.2d 93, 101 [7th Cir. 1972] ["vigorous" eight hour questioning interrupted by several breaks did not make confession involuntary]); *see also William v. Nye*, 869 F. Supp. 867, 871 (D. Kan. 1994), *aff'd*, 83 F.3d 434 (10th Cir. 1996) (under totality of the circumstances, "troubling" nineteen-hour span spent with police did not render confession involuntary).

The investigating officers used no improperly coercive questioning tactics.  It is true that Agent Altman lied when he told Defendant that his wife was at the CID office and had made a statement that was inconsistent with Defendant's.  It is also true that Agent Huston dissembled when he told Defendant he had not passed the first polygraph test, since the results were inconclusive.  However, "[i]t is well-settled that a confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him." *Lopez*, 437 F.3d at 1065 (citation and quotation marks omitted); *see also United States v. Blue*, 122 F. App'x 427, 430 (10th Cir. 2005), *cert. denied*, 545 U.S. 1135 (2005) ("Without more, however, misrepresentations, ruses, and trickery by questioning authorities do not render a voluntary confession involuntary. . . .").

Furthermore, while Agent Altman may have raised his voice and used profanity, the circumstances fail to suggest that such tactics overbore Defendant's will.  "Numerous cases have held that questioning tactics such as a raised voice . . . will not render a confession involuntary

12

unless the overall impact of the interrogation caused the defendant's will to be overborne." *Jenner*, 982 F.2d at 334.  After all, "[a]ny interview of one suspected of a crime will have coercive aspects to it."  *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  Rather than being overborne by Agent Altman's aggressive tone, Defendant matched it, and the situation was diffused by the intervention of the agent's supervisor.  Additionally, although Defendant had been informed of his right to end the interview or engage an attorney at any time, Defendant never expressed such a desire — not even in the face of aggressive questioning.  *See Jenner*, 982 F.2d at 334 (considering fact that interviewee never sought to halt interview or speak to an attorney in assessing voluntariness).

Looking next to Defendant's characteristics, I note he is over thirty years old, has a high school education, and has had previous encounters with law enforcement.  *See Blue*, 122 F. App'x at 430 (finding the fact that defendant was twenty-nine and had both a GED and prior experience with law enforcement mitigated coercive circumstances); *accord Toles*, 297 F.3d at 966.  Even though Defendant was suffering from back pain during the first interview, he nonetheless expressed his willingness to proceed.  (Tr. at 20–21 [Altman Test.].)  Thus, while the agents' use of lies, dissembling, harsh language, and lengthy interviews might well have introduced a measure of coercion into the interviews, Defendant was of such an age, mind, and degree of experience that he was not "unusually susceptible to coercion because of age, lack of education, or intelligence."  *Nguyen*, 155 F.3d at 1222; *see also Mathiason*, *supra*.

I reject Defendant's suggestion that he was "improperly influenced" by Agent Huston's assertion that Defendant would "get[] looked at with being charged" with sexual abuse if they did

not "get to the bottom" of C.T.'s allegations.  *See generally Bram v. United States*, 168 U.S. 532,

542–43 (1897) (stating the test of voluntariness is whether the confession was "obtained . . . by

the exertion of any improper influence").  The second interview was focused chiefly on the

allegations concerning the injury to C.J.'s genitals, so Agent Huston's assertion was wholly

sensible.  *See* 18 U.S.C.A. § 2246(3) (West 2007) (defining "sexual contact" as "the intentional

touching, either directly or through the clothing, of the genitalia . . . with an intent to abuse,

humiliate, harass, degrade, or arouse or gratify the sexual desire of any person"); *see also id.* §§

2241(c), 2244(a)(5) (making "sexual contact" a crime).  It is difficult to understand how

suggesting the possibility of prosecution for the commission of the very crime under investigation

might constitute unlawful coercion.  *Cf. United States v. White*, No. CRIM.A.04–240047–01–K,

2004 WL 2182188, at *4 (D. Kan. Sept. 21, 2004) (suppressing statement made after officer: [1]

promised to charge defendant with a misdemeanor if he cooperated; and [2] threatened to charge

defendant with a felony if he refused to cooperate).  Moreover, after he gave the November 10

statement, Defendant refused Agent Huston's invitation to undergo a third phase of polygraph

testing.  (Tr. at 134–45 [Huston Test.].)  This fact strongly suggests that Defendant's will was not

overborne during the interview.  *See United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987)

(where defendant "refused to give certain information" because he believed that information could

harm him, defendant's statements were not involuntary).

Finally, I reject Defendant's contention that he was coerced into attending the November

10 polygraph interview because he had been approached by Agent Hamilton on October 17, 2006.

(*See* Tr. at 141–43.)  Agent Hamilton's notes of that encounter reflect that he merely told

14

Defendant he could anticipate one or more FBI interviews in the near future and that his "full cooperation and candor" would be expected.  (Def. Ex. A–6 [10/17/06 Notes].)  Such an encounter could in no way be said to have contributed to circumstances whereby Defendant's will was overborne.

Although my analysis has taken up various aspects of the interviews individually, having considered the totality of the circumstances — including Defendant's back pain during the first interview, the aggressive tactics employed by Agent Altman, Defendant's brief encounter with Agent Hamilton, the length of the second interview, Agent Huston's suggestion that Defendant might face child abuse charges, and the deceptive tactics employed by both interviewers — I find that the Government has proven by a preponderance of the evidence that Defendant's statements were voluntary.  Accordingly, Defendant's motion to suppress must be denied.

**2.**     ***Motion for Hearing Concerning Alternatives to Live, In-Court Testimony***

The Government anticipates calling C.J. to testify regarding the alleged abuse.  (Govt.'s Mot. for Alternative to Live In Court [sic] Test. for Child Witness at 2 [filed July 20, 2007] [hereinafter "Govt. Test. Mot."].)  The Government believes that C.J. will be unable to testify in court because of "fear of [D]efendant and/or [C.J.] will suffer emotional trauma from testifying." (*Id.* at 3.)  Thus, the Government requests that: (1) it be allowed to present the testimony of a qualified expert regarding the propriety of having C.J. testify in the presence of Defendant; and, based upon such testimony, (2) this court permit C.J. to testify at trial via two-way, closed-circuit television.  (*Id.*)

In *Maryland v. Craig*, the Supreme Court identified several findings a trial court must make before denying a defendant's right to face-to-face confrontation with a child witness by permitting the child to testify via closed-circuit television. *Maryland v. Craig*, 497 U.S. 836, 855–56 (1990); *see also United States v. Sandoval*, No. CR 04–2362 JB, 2006 WL 1228953, at *11 (D.N.M. Mar. 7, 2006) (recognizing that one of the cases underpinning *Craig* had been overruled by *Crawford v. Washington*, 541 U.S. 36 [2004], but emphasizing that *Craig* itself had not); *accord Pesquera v. Jackson*, No. 06–CV–10186, 2007 WL 2874219, at *10 (E.D. Mich. Sept. 25, 2007). Under *Craig*, the trial court must: (1) "hear evidence and determine whether [closed-circuit testimony] is necessary to protect the welfare of the particular child witness who seeks to testify;" (2) "find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant;" and (3) "find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*, *i.e.*, more than mere nervousness or excitement or some reluctance to testify." *Id.* (citations and internal quotation marks omitted).

Following the *Craig* decision, Congress enacted the Child Victims' and Child Witnesses' Rights statute, which specified the procedures to be used in federal courts to allow a child victim to testify via closed-circuit television. *United States v. Farley*, 992 F.2d 1122, 1124 (10th Cir. 1993) (citing 18 U.S.C. § 3509). Section 3509(b)(1)(A) provides: "In a proceeding involving an alleged offense against a child, the attorney for the Government . . . may apply for an order that the child's testimony be taken in a room outside the courtroom and be televised by [two]-way closed circuit television." 18 U.S.C.A. § 3509(b)(1)(A) (West 2007). A district court may order

16

closed-circuit testimony if it finds "the child is unable to testify in open in the presence of the defendant" because: (1) "of fear;" or (2) "[t]here is a substantial likelihood, established by expert testimony, that the child would suffer emotional trauma from testifying." *Id.* § 3509(b)(1)(B)(i)–(ii).  In making its determination, a court may also "question the minor in chambers . . . on the record for a reasonable period of time with the child attendant, the prosecutor, the child's attorney, the guardian ad litem, and the defense counsel present." *Id.* § 3509(b)(1)(C).  After considering the evidence, the court must support a ruling on the child's ability to testify with findings on the record.  *Id.*

In *United States v. Carrier*, the Tenth Circuit raised the question whether section 3509's requirements wholly comport with those set forth in *Craig*.  9 F.3d 867, 870–71 (10th Cir. 1993).  Ultimately, the court left this question unresolved.  *Id.*  Nevertheless, the court clearly stated: "Together, the statute and *Craig* require a case-specific finding that closed circuit testimony is necessary for a child because the child would suffer more than *de minimis* fear or trauma, and in fact would be unable to testify because of such fear or trauma, brought on by the physical presence of the defendant." *Id.* at 871.  Thus, "[g]eneral trauma experienced by retelling the events or because of the intimidating atmosphere of a courtroom will not justify use of closed circuit procedures." *Farley*, 992 F.2d at 1125 (citing *Craig*, 497 U.S. at 855).

As the record presently stands, I have nothing beyond the parties' unsupported representations concerning the impact that testifying before Defendant would have on C.J. (*See* Govt. Test. Mot.; Def.'s Resp. to Govt.'s Mot. for Alternative to Live In-Court Test. for

Child Witness [filed July 27, 2007].) Accordingly, I grant the Government's request to present expert testimony.

**3.     *Motion for Reciprocal Discovery***

The Government seeks production of the reports of an investigator working with defense counsel who interviewed each of the children involved in this case. (Govt.'s Mot. for Reciprocal Disc. and Other Relief as Deemed Appropriate at 2–3 [filed Oct. 9, 2007] [hereinafter "Govt. Disc. Mot."].) Although the Government recognizes such production is "not technically required" unless and until the investigator is called as a witness at trial, the Government contends that production is "in the interest of fairness and efficiency" because it suspects that one or both of the child witnesses may have recanted prior statements. (*Id.* at 4–5.) Defendant maintains that the reports are shielded by the attorney work product privilege. (Def.'s Resp. to Govt.'s Mot. for Reciprocal Disc. and Other Relief as Deemed Appropriate [filed Oct. 15, 2007] [hereinafter "Def. Disc. Resp."].)

While the interest of "efficiency" might well be served by requiring Defendant to produce his reports, the interest of "fairness" would most assuredly be undermined. In *United States v. Nobles*, the Supreme Court reiterated that the attorney work product doctrine protects material prepared by "investigators and other agents" upon which an attorney relies. 422 U.S. 225, 238–39 (1975). However, the court recognized that when a defendant seeks to adduce the testimony of such an investigator or agent at trial, the work product privilege is waived with respect to matters covered in the testimony. *Id.* at 239.

In the instant case, trial is not upon us.  Moreover, Defendant represents that he has yet to decide whether he will call his investigator as a witness at trial.  (Def. Disc. Resp. at 2.)  While the prosecution would most certainly be aided by the present disclosure of the investigator's report, the work-product doctrine protects broader concerns:

> Were [privileged] materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten.  An attorney's thoughts, heretofore inviolate, would not be his own.  Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial.  The effect on the legal profession would be demoralizing.  And the interests of the clients and the cause of justice would be poorly served.

*Nobles*, 422 U.S. at 238 (citation and quotation marks omitted).  The Government's motion for discovery into privileged matters must, therefore, be denied.

**4.     *Conclusion***

Based on the foregoing it is therefore ORDERED that:

1.     DEFENDANT's motion (#26) to suppress is DENIED.

2.     The GOVERNMENT's motion (#39) for alternative to live, in-court testimony is GRANTED in part.  The parties will forthwith set hearing at which the Government may present the testimony of an expert regarding the need for closed-circuit testimony.

3.     The GOVERNMENT's motion (#53) for reciprocal discovery is DENIED.

Dated this 2nd day of November, 2007

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge